**STATE of Alaska, Petitioner,**

v.

**William L. PRATER, Respondent.**

**No. A–6460.**

Court of Appeals of Alaska.

May 22, 1998.

Douglas H. Kossler, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

John E. McConnaughy, III, Assistant Public Defender, Palmer, and Barbara K. Brink, Public Defender, Anchorage, for Respondent.

Before COATS, C.J., and MANNHEIMER and STEWART, JJ.

## OPINION

COATS, Chief Judge.

In this case, we expand upon a point we previously noted without elaboration in *Mix v. State*, 893 P.2d 1270, 1273 (Alaska App.1995): in certain circumstances, relevant information known to a police dispatcher may be "imputed" to a police officer who conducts an investigative stop and so may be considered for purposes of evaluating whether the stop was supported by a reasonable suspicion of imminent public danger.

The state charged William L. Prater with felony driving while intoxicated, a class C felony because Prater had been twice convicted within the past five years, and with driving while license revoked, a class A misdemeanor. AS 28.35.030(n); AS 28.15.291.

According to the police reports to which the parties acceded for purposes of Prater's suppression motion, on the evening of August 20, 1996, Reserve Officers Lammot and Lissner heard an Alaska State Troopers' dispatch

that a "REDDI"[1] report had been received regarding an intoxicated driver. The report described a white Ford Escort with Alaska license plate number CYT 249 traveling toward Palmer on the Palmer–Wasilla Highway. Moments later, Lammot and Lissner spotted the car and performed a traffic stop. The driver, Prater, then failed field sobriety tests and was arrested for driving while intoxicated and driving while license revoked.

The REDDI report had contained additional details that had not been broadcast to the officers in the police dispatch. The caller who had made the report, a male, had added that the drunken driver in the described car at the described location had not possessed a driver's license and had been arrested before for driving while intoxicated; the caller had stated that he knew this information because he personally knew the driver, who had just left the residence. The caller gave the driver's name as William Prater and spelled out the last name. The caller did not identify himself, but the 911 log recorded the telephone number of the caller.[2]

Prater moved to suppress the evidence resulting from the traffic stop, arguing that it had not been justified by reasonable suspicion. Superior Court Judge Beverly W. Cutler granted the motion and suppressed the evidence. Judge Cutler ruled that any information from the REDDI report that had not been communicated to the officers could not be considered in evaluating whether the stop was justified; the judge ruled that the dispatcher could not be considered part of the "police team" or as a "fellow officer," so his or her information could not be imputed to the officers who stopped Prater. In her decision, Judge Cutler relied on language from this court's recent opinion in *Mix v. State,* 893 P.2d 1270 (Alaska App.1995). She stated:

> The potential problem with imputing to the arresting officers other background infor-

mation that the anonymous caller had conveyed to the dispatcher is noted in *Mix:* "if a dispatched 'locate' could by itself create reasonable suspicion, an officer prompted not by a tip at all, but only [by] a hunch, could relay a description and license number through the dispatcher and thereby effectuate a lawful stop." *Mix* at 1272–73.

(Alteration omitted by Judge Cutler but included in *Mix.*) Excluding the information known to the dispatcher but not broadcast to the officers, Judge Cutler went on to rule that there was insufficient information to justify the stop:

> The arresting officers in this case did not receive sufficient details from the dispatcher to establish "specific and articulable facts which create a reasonable suspicion that imminent public danger exists." *Coleman [v. State,* 553 P.2d 40,] 46 [ (Alaska 1976) ]. Nor did they make such observations themselves.

The judge therefore granted Prater's motion to suppress the evidence stemming from the investigative stop of his car. The state petitioned this court to review Judge Cutler's order, and this court granted the petition.

The state does not contend that Judge Cutler erred in her second ruling: that the information that had been broadcast in the trooper dispatch, consisting as it did only of a description and location of a vehicle, did not by itself suffice to create reasonable suspicion. The sole issue in this petition is the correctness of Judge Cutler's first ruling: that the additional information in the REDDI report known to the dispatcher could not be imputed to the officers or considered in determining whether there was reasonable suspicion to justify the stop.

This court did not decide this issue in *Mix.* This court's *Mix* opinion focused on the stopping officer's actual knowledge, information,

---

1. This acronym stands for "Report Every Drunk Driver Immediately," a community service program that encourages citizens to alert the authorities when they believe they have encountered an intoxicated driver. This court previously described the REDDI program in *Effenbeck v. State,* 700 P.2d 811, 812 n. 1 (Alaska App.1985).

2. Two weeks later, the troopers' investigation into this telephone number identified a person who admitted to having made the REDDI report.
   The state does not argue that this information, which was not known to the police at the time of the investigative stop, should be "imputed" to the stopping officers or considered when determining whether the stop was justified.

and observations and points out that there was no information available to him other than a cursory radioed dispatch and the fact that the officer observed the described car thirty seconds later. *See Mix,* 893 P.2d at 1272 (*e.g.,* "Hoffman had absolutely no information . . . ," "Hoffman had no further insight . . . ," etc.). However, in the concluding paragraph of the *Mix* opinion, this court left open the possibility that additional evidence might suffice even if it were known only to the dispatcher as opposed to the officer:

> In this case, in which the officer making the stop had no indication that the "locate" was based on reliable firsthand information and in which *the state presented no evidence that the dispatcher* or some other officer *had relevant knowledge that could possibly be imputed to Officer Hoffman,* we cannot find that the stop was supported by a reasonable suspicion of imminent public danger.

*Id.* at 1273 (emphasis added).

In *Mix* this court relied on and quoted language from the then-latest edition of LaFave's treatise on search and seizure. *See Mix,* 893 P.2d at 1272. The corresponding section of the nowlatest edition of this treatise sets out the following requirements (quoted from *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985)) governing whether a stop based on a directive through police channels will be upheld:

> [I]t is only necessary that (i) the officer making the stop have acted "in objective reliance on a flyer or bulletin"; (ii) "the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop"; and (iii) "the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department."

4 Wayne R. LaFave, *Search and Seizure* § 9.4(i), at 233–34 (3d ed.1996) (footnotes omitted). In *Hensley,* the United States Supreme Court upheld an investigative stop

that police made on the basis of a "wanted" flyer even though the police who actually conducted the stop did not personally know of any facts underlying reasonable suspicion to stop Hensley, on the ground that the police who had issued the "wanted" flyer had personally known of facts constituting reasonable suspicion. *Hensley,* 105 S.Ct. at 683–84.

Most of the cases cited by LaFave that apply these requirements, including *Hensley,* involve information or directives from a police officer, as opposed to a dispatcher, and acted upon by another police officer. Judge Cutler distinguished Prater's case from such cases on this ground, ruling that such cases involved "a 'police team' rule or 'fellow officer' rule" and that "[a] dispatcher at the police station does not have the same kind of 'team' connection with the arresting officers in this case." On appeal, Prater argues that this ruling is correct and that knowledge possessed by dispatchers, as opposed to officers, can never be imputed to the officers who stop or seize. However, LaFave also cites some cases that do involve broadcasts by dispatchers, and it appears from them that the majority rule is that information known by the dispatchers and on which the broadcast dispatch is based will indeed be considered in determining whether the dispatch and, therefore, the stop is supported by reasonable suspicion. *See, e.g., United States v. Cutchin,* 956 F.2d 1216, 1217–18 (D.C.Cir.1992); *Olson v. Comm'r of Pub. Safety,* 371 N.W.2d 552, 555–56 (Minn.1985); *State v. Franklin,* 841 S.W.2d 639, 643 (Mo. 1992) (en banc).[3]

We are guided by an Alaska Supreme Court case that appears to have at least implicitly applied this majority rule. In *Mattern v. State,* 500 P.2d 228 (Alaska 1972), a citizen made two telephone calls in the middle of the night to the police: the first stating that someone was in the apartment below hers and the occupant of the apartment was away and the second stating that a white Dodge van with its lights turned off was

**3.** LaFave also cites with a "But see" signal a case apparently exemplifying a minority rule to the contrary: *State v. Miller,* 510 N.W.2d 638 (N.D.1994). This case is criticized in Comment, James R. Salisbury, *Criminal Procedure—Due Process: Towards More Effective Law Enforcement—Utilization of Collective Knowledge to Sustain a Reasonable Suspicion Inquiry,* 71 N.D. L.Rev. 797 (1995).

driving away. *Id.* at 229. The "police dispatcher" broadcast two radio bulletins, the first stating that a burglary was in progress on Second Avenue and the second stating that a white Dodge van was leaving the area with its lights off. *Id.* Based on the dispatches, two officers stopped the van and eventually arrested the occupants. *Id.* at 229–30. The supreme court held that the seizure of evidence was not the fruit of an "illegal detention," in part because the details of the phone calls that had not been broadcast to the police officers contributed to "probable cause to arrest":[4]

> The police dispatcher told the arresting officers that a burglary was in progress and then reported that the burglar was leaving the scene in a white Dodge van without lights. Information relayed to a police officer via the police radio may provide probable cause to arrest. However, when one officer furnishes evidence to another officer which leads to an arrest, the state must prove the reasonable basis of the former officer's information. The radio dispatch was based upon Mrs. Mer[r]ell's call to the police that she heard noises in her friend's empty apartment below. She also reported an unfamiliar vehicle leaving the area without lights.

> In a large city Mrs. Merrell's report to the police and Mattern's furtive manner in leaving the scene would not perhaps be particularly evocative of a belief that a burglary had been committed. In a large urban area neighbors are often anonymous. Ketchikan, however, is a relatively small community where people are likely to know their neighbors and are interested and aware of their movements. An unfamiliar car in a larger city might not arouse suspicion but it will be noticed in a smaller community. Thus we feel that Mrs. Merrell's report to the police that someone was illegally in her neighbor's empty apartment and

the subsequent strange behavior of the defendant in driving his car away from this apartment in the middle of the night, without benefit of headlights and passing by his own street, although he told the police he was going home, are sufficient in this case to give the police probable cause to believe that Mattern had committed a burglary in Carol Krebs' apartment.

*Id.* at 232–33 (footnotes omitted).

We conclude that Judge Cutler erred by ruling that a dispatcher's knowledge can never be considered in evaluating whether an investigative stop is justified unless the dispatcher specifically communicates that knowledge to the stopping police officer. Instead, we apply the rule set out by the United States Supreme Court in *Hensley:* an investigative stop made in objective reliance on a police dispatcher's bulletin is justified if the dispatcher who broadcast the bulletin possessed reasonable suspicion of imminent public danger justifying the stop. *See Hensley,* 105 S.Ct. at 682.

We therefore remand this case so that Judge Cutler may evaluate the underlying facts and unbroadcast details of the telephone call to the dispatcher[5] and consider them in deciding whether the investigative stop in this case was supported by reasonable suspicion. Reasonable suspicion to stop a vehicle may be based on a sufficiently detailed telephoned report that the driver may be driving while intoxicated. *See Goodlataw v. State,* 847 P.2d 589, 590–91 (Alaska App.1993); *Effenbeck v. State,* 700 P.2d 811, 812 (Alaska App.1985).

We VACATE the superior court's order and REMAND for further proceedings. We do not retain jurisdiction in this case.

---

**4.** Alaska law had not yet adopted the reasonable-suspicion investigative-stop standard: "We do not feel that this case is a proper vehicle for discussion of the stop and frisk question." *Mattern,* 500 P.2d at 233 n. 15.

**5.** Although the state has already submitted more details about the original 911 call than were broadcast in the dispatch, Prater has explicitly

agreed with this offer of proof below "as to the contents of the REDDI report received by AST dispatch," and Judge Cutler has therefore denied an evidentiary hearing to further develop these unbroadcast details, on remand we do not preclude Judge Cutler from hearing any further evidence regarding these details.